[S. F. No. 17573. In Bank. Dec. 30, 1947.]

MABEL DIERMAN, Appellant, v. PROVIDENCE HOSPITAL (a Corporation) et al., Respondents.

Gladstein, Andersen, Resner, Sawyer & Edises, Geo. R. Andersen and Gladstein, Andersen, Resner & Sawyer for Appellant.

Hoge, Pelton & Gunther, Franklin C. Latcham, Johnson, Ricksen & Johnson, Johnson & Ricksen and Stanley C. Smallwood for Respondents.

SCHAUER, J.—This is an action for personal injuries allegedly caused by the negligence of defendants. Plaintiff entered defendant hospital for the purpose of having a wart on her nose removed and her tonsils excised; she was completely anesthetized by defendant Treadway; and defendant Libby, a physician and surgeon, used a hot electric needle to remove

the wart. After the wart had been taken off and as Dr. Libby was cauterizing the wound, there was an explosion, described as a "flash" and a "pop," above the face (and apparently within the oral and nasal passages) of the unconscious plaintiff and she sustained contusions and hemorrhages. ■ The case was properly tried on the theory that the doctrine of res ipsa loquitur applies. (*Ybarra* v. *Spangard* (1944), 25 Cal. 2d 486, 489, 494 [154 P.2d 687, 162 A.L.R. 1258].) A jury found for defendants and plaintiff appeals from the ensuing judgment in their favor. She contends that upon the record the jury should have been directed to find for her and that the evidence, as a matter of law, is insufficient to sustain the verdict. We have concluded that this contention is sound.

Defendant Libby arranged for plaintiff's admission into defendant hospital and planned the double-procedure operation. It was Dr. Libby's plan that plaintiff be initially anesthetized with nitrous oxide; that the administration of such gas be interrupted and with the anesthetizing apparatus completely shut off that the wart be removed by use of the hot electric needle; that plaintiff then, without regaining consciousness, be immediately anesthetized with ether; and that her tonsils be removed while she was under the influence of the ether. In accord with this plan, defendant Treadway, a nurse employed as an anesthetist, completely anesthetized plaintiff with nitrous oxide, then turned off the anesthetic, and Dr. Libby removed the wart. After the wart removal was complete Dr. Libby proceeded to "cauterize" the wound with the same hot electric needle and it was then that the visible "flash" and audible "pop" of the explosion occurred. The "flash" assertedly appeared about 6 inches from plaintiff's face and an equal distance from the face of Dr. Libby. Dr. Libby was not injured; he, of course, had not been anesthetized and his respiratory organs were not filled with either nitrous oxide or ether or a combination of the two. He did not remove plaintiff's tonsils, but at once attended to the injuries which she received as a result of the explosion. Both Dr. Libby and the anesthetist testified that they could not account for the "flash."

■ Upon any view of the evidence, however, it appears that the "flash" resulted from the electric needle igniting some combustible gas: either ether (which is highly combustible) or nitrous oxide (which assertedly is not combustible when pure, but may become so when contaminated by foreign substances). More specifically, the evidence shows four, and

only four, possible causes of the "flash" and explosion: the needle may have ignited (1) ether, or (2) nitrous oxide contaminated by unclean anesthetizing apparatus, or (3) nitrous oxide contaminated by the hospital, through an unidentified agency or dereliction, at some time after it was received from the manufacturer, or (4) nitrous oxide which was contaminated at the time it was purchased from the manufacturer. (It appears that the hospital purchased its anesthetics, including cans of ether and tanks of nitrous oxide, from an independent manufacturer.)

As to possible cause (1), defendants Libby and Treadway testified that the ether was not turned on at any time during the operation. As to possible cause (2), the nurse in charge of surgery testified that it is proper and customary procedure, in order to avoid contamination, for the anesthetist to wash out the breathing tube (which leads from the container of anesthetic to the patient's face) with soap and water immediately before its use. This nurse further testified that she saw defendant Treadway properly wash the tube used in anesthetizing plaintiff. Her testimony in this regard is exceedingly vague and self-contradictory. Defendant Treadway, who best knew whether she had washed the tube with due care (and, perhaps, whether the ether had been turned on too soon), was not present at the trial, having, it was said, permanently removed her residence to Texas. Her testimony was by deposition taken in California at a time when she expected to change her residence. The deposition contains no reference to the washing of the tube.

Regardless, however, of the weight to which the testimony of the nurse or that of the defendant Treadway may be entitled (see Code Civ. Proc., § 1963, subds. 5, 6), defendants did not produce in evidence the tank of nitrous oxide which was used to anesthetize plaintiff, did not explain why they did not produce it and did not even attempt to show by chemical analysis, which would have been the highest form of proof as to this fact, whether the gas was pure or was contaminated. Contamination of the nitrous oxide, as a possible cause of the explosion, was suggested by an expert witness for defendants, a doctor who had no personal knowledge of the accident, but who was an anesthetist and who stated his opinion that such cause was a "possibility" or "probability." This doctor further testified that the nitrous oxide in a tank could be analyzed to determine whether it was chemically pure; that a "spot

test'' would be reasonably determinative as to the purity of the contents of a tank of the gas; that it would be necessary to analyze the entire contents of a tank in order to be "absolutely certain it is entirely pure"; that such a complete analysis would be a "long process"; that the length of time required for such analysis would depend upon the character of the apparatus used. Whether the defendants, after the accident, actually made any test whatsoever of the contents of the tank from which the nitrous oxide had been administered to plaintiff does not appear. At the trial defendants made no attempt to show that the tank, with its remaining contents, was not even then available for tests; nor did they show whether the remaining contents, after the accident to plaintiff, had been discarded or used on other patients.

As to possible cause (3)—that the nitrous oxide was contaminated by the hospital through the acts or neglects of its agents at some time after it was purchased and before it was administered to plaintiff—there is no testimony as to whether the hospital did or did not use due or any care to keep the gas pure after it was received from the manufacturer. It is not shown whether the gas would deteriorate from age; or from the type of container in which it was kept; or from the condition of the particular container or the circumstances under which it was stored or under which portions of its contents may have been extracted for use. The above mentioned nurse in charge of surgery testified that she did not know whether the tanks of gas remained in the operating rooms for a day, a month, or a year after they were received from the manufacturer. The chief engineer of defendant hospital, who had charge of the purchasing of the anesthetics, gave no evidence as to the manner in which the tanks of gas were kept by the hospital. As stated above, defendants apparently made no effort to ascertain whether the tank of gas was contaminated when it came into their hands. All this explanatory—and perhaps exculpatory, perhaps incriminatory—evidence as to the condition of the nitrous oxide was either in the possession of or available to defendants and was not in the possession of or available to plaintiff.

The showing here goes farther than the establishment of a mere prima facie case under the doctrine of res ipsa loquitur. Not only is there a prima facie showing that the accident is one which in the ordinary course of events would not have happened if defendants had used due care but the defendants themselves have established the "possibility" or

"probability" that they used an impure and, under the circumstances, dangerous anesthetizing agent. That agent, the nitrous oxide, was at all times concerned in the exclusive possession and control of defendants. If such nitrous oxide was not impure, it was in the power of defendants to prove the fact; if it was impure, as their evidence suggests, then the burden was on them to account for the impurity. The defendants offered to prove neither that the gas was pure nor that they were not responsible for its impurity. ■ We are constrained to the conclusion that in a res ipsa loquitur case where, in addition to the prima facie showing of negligence, it is admitted or appears without dispute that the defendant has it in his power to produce substantial evidence material to the issue of negligence but fails to do so, it must be presumed that such evidence, if produced, would have been adverse to defendant, and under such circumstances the evidence is insufficient to support a verdict for the defendant and plaintiff is entitled to a directed verdict.

■ This is not to say that a defendant in a res ipsa loquitur case has the burden of proving himself free from negligence. It is not to say that a defendant must in every such case produce evidence of the actual cause of the accident. It is not to say that the question of the sufficiency of a defendant's explanation—or, if he cannot explain, the sufficiency of his evidence of due care and of impossibility of explanation—is not ordinarily for the jury. The general principle is, as stated by this court in 1919 (in denying a hearing in *Bourguignon* v. *Peninsular Ry. Co.*, 40 Cal.App. 689, 694-695 [181 P. 669]) "that where the accident is of such a character that it speaks for itself, as it did in this case, . . . . the defendant will not be held blameless except upon a showing either (1) of a satisfactory explanation of the accident, that is, an affirmative showing of a definite cause for the accident, in which cause no element of negligence on the part of the defendant inheres, or (2) of such care in all possible respects as necessarily to lead to the conclusion that the accident could not have happened from want of care, but must have been due to some unpreventable cause, although the exact cause is unknown. In the latter case, inasmuch as the process of reasoning is one of exclusion, the care shown must be satisfactory in the sense that it covers all causes which due care on the part of the defendant might have prevented."

The defendants have not met either test above stated. They did not show "a definite cause for the accident" unless it was the use by them of an impure or contaminated anesthetizing agent. Such "definite cause" is not shown to possess "no element of negligence" on their part, although evidence material to this issue was available to them. And in respect to an exclusionary showing, as has been pointed out above, the evidence fails in several respects to support a conclusion "that the accident could not have happened from want of care"; it fails in this regard not because of any showing of impossibility of proof but, rather, because defendants having the ability to produce it chose not to do so. It is therefore apparent that upon any reasonable view of the record, and giving effect to the rules of law hereinabove discussed, the verdict for the defendants cannot be sustained.

For the reasons above stated the judgment is reversed and the cause remanded for a new trial.

Gibson, C. J., Shenk, J., and Carter, J., concurred.

TRAYNOR, J.—I dissent.

I cannot agree that the evidence is insufficient to sustain the verdict. In *Ybarra v. Spangard,* 25 Cal.2d 486 [154 P.2d 687, 162 A.L.R. 1258], this court held that it was error to enter a judgment of nonsuit against a plaintiff who, because he was unconscious during an operation, is unable to specify which of several doctors and nurses in attendance during the operation were negligent. It was held that such a plaintiff can rely on the doctrine of res ipsa loquitur to avoid a judgment of nonsuit, and that at the trial those in attendance during the operation have the burden of giving an "initial explanation" of the accident and their conduct. "We merely hold that where a plaintiff receives unusual injuries while unconscious and in the course of medical treatment, all those defendants who had any control over his body or the instrumentalities which might have caused the injuries may properly be called upon to meet the inference of negligence by giving an explanation of their conduct." (25 Cal.2d 494.) In the present case, the court proceeded to a trial on the issue of defendants' negligence. The evidence showed without conflict that the accident was caused by an explosion during the operation, and that the explosion might have resulted from causes other than negligent conduct of any person in attendance during the operation. There was also evidence explaining the

conduct of defendants, which convinced the jury that they exercised due care in performing their duties. Since defendants sustained the burden imposed upon them under the doctrine of res ipsa loquitur as applied in the Ybarra case, the jury was free to return a verdict for defendants.

The applicability of the doctrine of res ipsa loquitur cannot be determined in the abstract; it depends upon the evidence in each case. "The doctrine . . . requires evidence which shows at least the probability that a particular accident could not have occurred without legal wrong by the defendant." (*Escola* v. *Coca Cola Bottling Co.*, 24 Cal.2d 453, 459 [150 P.2d 436].) Such a probability may be dispelled when the facts become known. (*Maryland Casualty Co.* v. *Matson Navigation Co.*, 177 Cal. 610, 613 [171 P. 427]; *Druzanich* v. *Criley*, 19 Cal.2d 439, 444 [122 P.2d 53]; *Hinds* v. *Wheadon*, 19 Cal.2d 458, 461 [121 P.2d 724]; *Escola* v. *Coca Cola Bottling Co.*, 24 Cal.2d 453, 461 [150 P.2d 436]; *Ybarra* v. *Spangard*, 25 Cal.2d 486, 492, 494 [154 P.2d 687, 162 A.L.R. 1258]; *Manuel* v. *Pacific Gas & Electric Co.*, 134 Cal.App. 512, 517 [25 P.2d 509]; see *Klein* v. *Fraser*, 169 App.Div. 812 [155 N.Y.S. 848]; 1 Shearman and Redfield, Negligence, § 56, p. 154.) "When the defendant . . . offers evidence to show that the event was not due to his negligence, there is the . . . question of the extent to which the principle of res ipsa loquitur will survive in the face of such proof. It is generally agreed, except in two or three jurisdictions, that the burden of proof is not upon the defendant, and that he is required to do no more than to introduce evidence which, if believed, will permit the jury to say that it is as probable that he was not negligent as that he was." (Prosser, Torts, 308.) Two of the four possible causes of the explosion discussed in the majority opinion do not involve negligent conduct of any persons who were in attendance during the operation. If the nitrous oxide was contaminated when the manufacturer delivered it to the hospital, the explosion might have been caused by that anesthetic without fault on the part of any of the defendants. If the nitrous oxide became contaminated at the hospital before it was used on plaintiff, the hospital may be responsible for the negligence of an employee who kept the anesthetic, but none of the persons who were in the operating room during the operation would be at fault. In the Escola case, *supra,* where the explosion of a bottle filled by the defendant could have been caused by excessive pressure of the

carbonated beverage in the bottle or by a defect in the bottle, this court said: "The question is whether under the evidence there was a probability that defendant was negligent in any of these respects. If so, the doctrine of res ipsa loquitur applies. . . . Although it is not clear in this case whether the explosion was caused by an excessive charge or defect in the glass, there is a sufficient showing that neither cause would ordinarily have been present if due care had been used." (24 Cal.2d 459, 461.) The holding in that case rests on the conclusion that due care required the defendant to examine the bottles delivered by the manufacturer. By applying proper methods of examination, the defendant could have discovered defects in the bottle. A doctor, hospital, or anesthetist may accept an anesthetic prepared by a manufacturer as being what it purports to be in the absence of circumstances indicating that the anesthetic might be impure. To require them to test anesthetics before use in the absence of such circumstances would involve the danger of contamination incident to the opening of the containers and the testing of their contents. Hence, when it was proved that plaintiff's accident resulted from an explosion during the operation and that the explosion might have causes other than the negligent conduct of any person who was in attendance during the operation, it could no longer be said that the accident probably could not have occurred without legal wrong by one of the persons attending the operation.

Under the evidence, the jury could determine not merely that negligent conduct of the doctor and the anesthetist was not proved, but that it was proved that they were not negligent. Both testified that no ether was used during the operation. Their testimony eliminated the use of ether as a possible cause of the explosion. There was evidence that the nurse who acted as an anesthetist had 24 years' experience in administering anesthetics, that she was a graduate of a nursing college and had received postgraduate training in anesthesia, and that in the cleaning of the apparatus she was supervised by the nurse in charge of the operating rooms in the hospital. The latter testified that she saw the anesthetist clean the tube in the approved manner before it was used in the operation. The credibility of the witness was for the determination of the jury. It was also for the jury to determine whether an inference should be drawn from the fact that when her deposition was taken, the anesthetist did not testify as to whether or not she cleaned the tube. At that time,

plaintiff proceeded on the theory that the ignition of ether by the electric needle caused the explosion; her counsel therefore did not ask the anesthetist if she cleaned the tube. Again, it was for the jury to determine whether an inference should be drawn from the fact that defendants did not produce the container used at the operation to prove that the nitrous oxide in the container was contaminated. Even if the nitrous oxide that remained in the container after the operation was not contaminated, it would not necessarily follow that the nitrous oxide released from the container during the operation was not contaminated. If only part of the nitrous oxide was contaminated, that part could have been released from the container during the operation, while the pure oxide remained in the container. Even if the nitrous oxide in such a container is contaminated at the time of trial, it does not follow that it was contaminated at the time of the operation. The theory that contamination of the nitrous oxide in the container might be responsible for the explosion was not so obvious when the accident occurred as it may seem now, after an expert witness has explained that possibility. If liability of defendants followed as a matter of law from their failure to preserve such a container or to account for its absence, they would be penalized for failing to anticipate a lawsuit and to prepare their defense thereto.

In any event, it was for the jury to draw inferences from the failure to produce the container or to account for it and to weigh them with the other evidence in the case. It is not for this court to reject the conclusions of the jury, since there is ample evidence to support them. By doing so, it not only substitutes its own judgment for that of the jury, but makes the possibility of such a substitution one to be reckoned with in future cases, and thereby enlarges that uncertainty in the law which in the long run causes more hardship than it alleviates.

Under the doctrine of res ipsa loquitur, the majority opinion in effect imposes upon a defendant even more than the burden of proving that he was not negligent. It imposes the burden of proving the actual cause of the accident, for that is the only practical way under the opinion that defendants can show that they were free from fault. The imposition of such a burden necessarily involves the adoption of a rule on grounds of policy that persons in attendance during an operation must explain not only their own conduct, but the conduct of any

other person, such as a manufacturer of anesthetics, who might conceivably be responsible for the accident, as well as the forces of nature that brought it about. Such a rule would impose upon doctors, nurses, and members of hospital staffs absolute liability for unusual accidents that they cannot explain and might discourage their attending operations. A person about to undergo an operation is generally aware that there may be unforeseeable dangers incident thereto. He is entitled to an explanation of the conduct of the persons attending the operation, but he cannot reasonably expect them to be insurers of his safety.

Edmonds, J., and Spence, J., concurred.

Respondents' petition for a rehearing was denied January 26, 1948. Edmonds, J., Traynor, J., and Spence, J., voted for a rehearing.