[Civ. No. 16270.   First Dist., Div. One.   June 7, 1955.]

FRANK BAUER, Appellant, v. MARIE OTIS et al., Respondents.

Cooper, White & Cooper and George A. Helmer for Appellant.

Lamb, Hoge & Killion for Respondents.

BRAY, J.—Should proffered instructions on res ipsa loquitur have been given, is the sole question presented on this appeal by plaintiff from a judgment in favor of defendants in an action for malpractice brought against defendant Otis, a nurse, and defendant Hayes, a medical doctor.

### FACTS

The complaint states two causes of action, one for negligance against both defendants, the other against Dr. Hayes alone for negligence in employing an unqualified nurse to administer the injection hereafter mentioned. Plaintiff was nonsuited on the second cause of action but does not appeal therefrom.

The lawsuit arises from an injection given plaintiff by Nurse Otis, which caused him serious injury. About May 23, 1950, plaintiff went to Dr. Hayes for treatment to his right leg, from which he was suffering severe pain. Dr. Hayes diagnosed the condition as neuritis and prescribed injections. That day the doctor gave him an injection in the right arm. On subsequent days plaintiff received similar injections, some given by the doctor and some by the latter's nurse, Otis. With the doctor's approval, plaintiff went to Calistoga to take mineral bath treatments. Failing to respond thereto, plaintiff returned to Dr. Hayes. During August and September, the doctor increased the frequency of the injections. October 12th, just before noon, plaintiff appeared at the doctor's office. According to him, Nurse Otis appeared ex-

cited. She had difficulty in inserting the needle in plaintiff's right arm. Finally she got the needle in. Plaintiff began to "holler" because of terrific pain which engulfed his entire arm. Never before had the injections caused such a severe, sharp pain. About a minute after the injection the pain went down to plaintiff's wrist, and his hand "dropped" (known as "wrist drop"). Plaintiff broke into a sweat. The nurse ordered him to soak his hand in hot water. Dr. Hayes phoned in about this time and the nurse explained plaintiff's situation. Shortly thereafter the doctor arrived and told plaintiff he would be all right in two hours. Plaintiff remained there until about 5:30 p. m. but despite hot packs and electrical treatments, was no better. For about 10 days thereafter, plaintiff received daily treatments from the doctor but did not improve. Early in November plaintiff consulted Dr. Morrissey who at first gave him treatment similar to those given by Dr. Hayes. March 7, 1951, pursuant to Dr. Morrissey's advice, he was operated on at about the same spot in which he had received the last injection. Plaintiff. has shown some improvement, but three years after the operation he still has his arm in a brace and is unable to work. Plaintiff claims that never prior to the last injection had he complained of pain in his right arm. About September, 1951, he discovered that the pain in his leg was due to fallen arches. By the use of special shoes he has obtained relief.

Dr. Hayes admitted that the injections were given by Nurse Otis within the scope of her employment by him. The substance injected with a solution of vitamin B complex; having the trade name "Thex." The doctor returned to his office in response to the nurse's statement that plaintiff was in distress because of the injection. Plaintiff was complaining that he could not move his fingers satisfactorily and was suffering from hysteria produced by extreme pain. Plaintiff was either unable or unwilling to extend his wrist even after a sedative was given, and massage, diathermy and electrical treatments administered. Dr. Hayes had no definite recollection as to whether plaintiff had a wrist drop at that time, but the former's chart has no record of it, and therefore the doctor would assume that he did not, and attributed plaintiff's trouble to hysteria. When plaintiff first came to the office, he complained of trouble in both his right arm and his leg. Dr. Hayes diagnosed the condition as sciatic neuritis, complicated by debilitation (malnutrition). The normal practice

is to make these injections in the deltoid muscle in the outer, upper portion of the arm.

Nurse Otis testified that she had made intramuscular injections "hundreds of times." On the occasion in question she inserted the needle in plaintiff's deltoid muscle. Plaintiff always complained when she gave him injections. As she began this injection (about ½ c.c. injected) plaintiff complained of pain and she stopped for a moment and pulled the needle back slightly ("which is not too unusual"). She asked plaintiff if it was better and on his replying affirmatively she began injecting him (another ½ c.c. injected). He said that hurt him terribly. So she removed the needle (without injecting the remaining 1 c.c.), massaged the arm, and told plaintiff that as he complained too much she would not complete the injection.

Bearing upon the cause of plaintiff's injury (in addition to the facts above stated) and the proper method and effect of injections was the following testimony:

Dr. Morrissey, who operated on the arm, testified that he found a lesion of the right radial nerve, that is, an interruption in its function. The operation disclosed that the radial nerve was indurated, that is, incorporated in thickened scar tissue. Based upon the case history given him by plaintiff, it was Dr. Morrissey's opinion that the lesion occurred at the time of the injection. The injury was not caused by hysteria. "If the Thex was injected into the deltoid muscle it could not have caused the paralysis of the radial nerve." It is not common medical knowledge that the injection of any solution in the deltoid muscle may cause injury to the radial nerve.

Dr. Hayes testified that while under ordinary circumstances an administration of Thex will not cause a wrist drop, it is possible for the solution to travel to a different portion of the arm. Almost all solutions are known to be dangerous to nerves. If a volume of blood, caused by hemorrhage, joined the solution, it could travel to the nerve, surround it and cause the scar tissue found by Dr. Morrissey. This is a known danger in any injection. Thex is extremely irritating.

Dr. Ryan, called by defendants, testified that from a study of Dr. Morrissey's operation record, it can be definitely stated that the radial nerve had not been punctured or severed. Injections frequently cause hemorrhages which can cause liquid to gravitate to other portions of the arm, with the formation of scar tissue and pressure signs on the nerves

as a result. In his opinion such a hemorrhage caused the scar tissue and injury to plaintiff's nerve. It is not improper practice to give an injection into the deltoid muscle tissue immediately surrounding the radial nerve.

## Res Ipsa Loquitur

■ "As a general rule, res ipsa loquitur is applicable where it appears that the accident is of such a nature that it can be said, in the light of past experience, that it *probably* was the result of negligence by someone and that the defendant is *probably* the person who is responsible. [Citation.]" (*Stanford* v. *Richmond Chase Co.*, 43 Cal.2d 287, 292 [272 P.2d 764]; injuries allegedly caused by negligent operation of a fork lift; emphasis added; *Zentz* v. *Coca Cola Bottling Co.*, 39 Cal.2d 436, 442-443 [247 P.2d 344] (exploding bottle); *La Porte* v. *Houston*, 33 Cal.2d 167, 169 [199 P.2d 665] (lurching automobile); and Prosser on Torts, p. 297.)

Of three older cases, Prosser writes (37 Cal.L.Rev. 195): ". . . the California courts have fallen into the error of saying that the inference of negligence must be so compelling as to exclude all other inferences and leave no other acceptable cause for the accident. Of course this is wrong." Later cases have corrected this error, as Prosser says, page 196: "The more recent decisions have recognized the error, and have held that the inference is not required to be an exclusive or compelling one. It is enough that the court cannot say that reasonable men could not draw it."

■ The conditions required for the application of the doctrine are: (a) There is a basis of experience, either common to the community or brought out in evidence, from which it may reasonably be concluded that the accident is of a kind which does not normally occur unless someone has been negligent. (b) It must be caused by an agency or instrumentality within the exclusive control of the defendant. (c) It must not have been due to any voluntary action or contribution on the part of the plaintiff. (See Prosser on Torts, p. 295; *Ybarra* v. *Spangard*, 25 Cal.2d 486, 489 [154 P.2d 687, 162 A.L.R. 1258].)

■ Obviously in this case conditions (b) and (c) were present. The needle, syringe and Thex were in the exclusive control of defendants, and plaintiff in nowise contributed to the injury. Was (a) present? We think it was. Immediately following the injection and as a result thereof, plaintiff received a "wrist drop." While injections and the use

of Thex are primarily medical matters, it is a matter of common knowledge among laymen that injections in the muscles of the arm, as well as other portions of the body, do not cause trouble unless unskillfully done or there is something wrong with the serum. Needle injections of cold shots, penicillin, and many other serums have become commonplace today. Hardly a man, woman or child (even those of tender age) exists in this country who has not had injections of one kind or another. Many persons have had numerous injections. Right now, thousands of children have received, and it is planned that practically all children shall receive (and possibly most adults) injections of Salk polio vaccine. So the giving and receiving of injections and the lack of nerve injury therefrom ordinarily has become a matter of common knowledge. If something does go wrong it is a matter for explanation by the person causing the injury. In *Cavero* v. *Franklin etc. Benevolent Soc.*, 36 Cal.2d 301 [223 P.2d 471], a child died after a tonsillectomy, due to the negligence of the anesthetist. Prior to surgery the child was healthy and normal with a slight temperature due to his infected tonsils and adenoids. Holding that it is common knowledge that anesthesia properly applied causes no injury, res ipsa loquitur was applied. In *Thomsen* v. *Burgeson*, 26 Cal.App.2d 235 [157 P.2d 637], in performing a tonsillectomy the doctor also removed the plaintiff's uvula and a portion of the palate. In applying the doctrine the court held that it was a matter of common knowledge that the removal of the other portions of the plaintiff's body was no part of a tonsillectomy. In *Agnew* v. *City of Los Angeles* (1947), 82 Cal.App.2d 616, 619 [186 P.2d 450], it was held to be common knowledge that failure of a doctor to take X-rays in the event of a possible fracture is negligence. Certainly if expert testimony is not indispensable in cases involving improper use of anesthesia, improper tonsillectomies, failure to use X-rays, there can be no question but that it is likewise not indispensable in cases involving injections. Or, put another way, if the layman has common knowledge of the ordinary and usual effects of properly used anesthesia, proper tonsillectomy surgery, and the necessity for X-rays in cases of fracture, he certainly has common knowledge of the ordinary and usual effects of injections in the muscles. Undoubtedly more persons, young and old, have had experience with injections than all those experiencing tonsillectomies and anesthesia put together. .

See also the following cases where res ipsa loquitur was applied: *Brown* v. *Shortlidge*, 98 Cal.App. 352 [277 P. 134], gag used during tonsillectomy knocked out the plaintiff's tooth; *Inderbitzen* v. *Lane Hospital*, 124 Cal.App. 462 [12 P.2d 744, 13 P.2d 905], and *Barham* v. *Widing*, 210 Cal. 206 [291 P. 173], failure to sterilize hands or instruments; *Ales* v. *Ryan*, 8 Cal.2d 82 [64 P.2d 409]; *Bowers* v. *Olch*, 120 Cal. App.2d 108 [260 P.2d 997], a sponge and a needle, respectively, left in a patient; *Moore* v. *Steen*, 102 Cal.App. 723 [283 P. 833]; *Timbrell* v. *Suburban Hospital, Inc.*, 4 Cal.2d 68 [47 P.2d 737], *McCullough* v. *Langer*, 23 Cal.App.2d 510 [73 P.2d 649], burns from X-ray, hot water bottle and red lamp; *Dickow* v. *Cookinham*, 123 Cal.App.2d 81 [266 P.2d 63, 40 A.L.R.2d 1066], cast causing ulcer.

So far we have discussed the case without relying upon the expert testimony. Nurse Otis testified that it would not be proper to inject within a half an inch of the radial nerve, that injections outside of the deltoid muscle are "never done." Dr. Morrissey testified that had the Thex been injected into the deltoid muscle the injury could not have occurred and that it is not common medical knowledge that an injection into the deltoid muscle might cause injury to the radial nerve.

Dr. Hayes testified that the common place for injections is the deltoid muscle and that the radial nerve is somewhat removed from that area. True, Dr. Hayes and Dr. Ryan gave testimony that contradicted Dr. Morrissey as to common medical knowledge. But that merely created a conflict of testimony for the jury to resolve. The court in giving res ipsa loquitur instructions could have qualified them by instructing the jury that if it should find that common medical knowledge was contrary to common layman knowledge, namely, that the injury here could have resulted without negligence, then it must not apply the doctrine.

Not in point are cases holding the doctrine not applicable, like *Huffman* v. *Lindquist*, 37 Cal.2d 465 [234 P.2d 34, 29 A.L.R.2d 485], where the doctor failed to diagnose the plaintiff's injury as a critical brain injury, and it was held that the question of negligence was one for expert testimony alone and not a matter of common knowledge; *Farber* v. *Olkon*, 40 Cal.2d 503 [254 P.2d 520], where the plaintiff, a mentally ill patient of a mental hospital, had his leg broken during shock treatment and where the court held that expert testimony established that the very purpose of such treatment was to throw the body into a convulsive state, and that the

most frequent and usual hazard is fractures which occur notwithstanding all precautions; *Engelking* v. *Carlson,* 13 Cal.2d 216 [88 P.2d 695], where a foot drop was caused by the severance of a nerve during an operation on the plaintiff's knee and where expert testimony established that such a result was "one of the difficulties of surgery." (P. 218.)

*Seneris* v. *Haas,* *(Cal.App.) 281 P.2d 278, cited by defendants is not in point. There the plaintiff claimed that her spinal cord had been injured because of negligence in the administering of a spinal anesthetic. The court held that the doctrine of res ipsa loquitur was not applicable (1) because the evidence failed to raise an inference that the plaintiff's resulting condition was in any way connected with the spinal anesthetic, but on the contrary, raised the inference that the injury was "caused by some condition existing in the patient's system" (p. 804) and (2) because the uncontradicted medical evidence was that in injections for spinal anesthesia there is always the danger of the needle coming in contact with the spinal cord, no matter how carefully done. It quoted (p. 804) with approval from *Engelking* v. *Carlson, supra,* 13 Cal.2d 216, 221: " 'Here what was done lies outside the realm of the layman's experience. Medical evidence is required to show not only what occurred but how and why it occurred.' "

In those cases it was established by expert testimony that the resulting injuries were a hazard that could be expected in the particular medical procedure. In our case, the evidence as to whether such a hazard existed was conflicting. As we have pointed out, the jury should have been permitted to determine if the hazard existed, applying the doctrine of res ipsa loquitur if it did not.

The judgment is reversed.

Peters, P. J., and Wood (Fred B.), J., concurred.

A petition for a rehearing was denied July 7, 1955, and respondents' petition for a hearing by the Supreme Court was denied August 3, 1955. Edmonds, J., and Traynor, J., were of the opinion that the petition should be granted.

---

*A hearing was granted by the Supreme Court on May 18, 1955.