[Civ. No. 23275. Second Dist., Div. One. May 1, 1959.]

CHAROLETTE McDONALD, a Minor, etc., Appellant, v. FOSTER MEMORIAL HOSPITAL, Respondent.

Morgan & Beauzay, Morgan, Beauzay, Smith & Holmes and David E. Smith, for Appellant.

Callaway, Kirtland & Packard, Robert C. Packard and Bertram L. Linz for Respondent.

LILLIE, J.—Plaintiff, a child of 10 years, was admitted to defendant hospital for the removal of tonsils and adenoids. She sustained certain injuries prior to surgery and sued defendant for damages caused by its alleged negligence. Although the cause involved four days of trial, and the jury had deliberated only less than three hours, the trial judge discharged the jury upon its failure to agree on a verdict. Motions for nonsuit and a directed verdict having been previously denied, defendant moved under section 630, Code of Civil Procedure, for judgment in its favor. The motion was granted and plaintiff has appealed from the judgment which followed.

█ Motions under section 630, Code of Civil Procedure, are governed by the same rules applicable to motions for nonsuit and directed verdict. Thus, they may properly be granted "when and only when, disregarding conflicting evidence, and giving to plaintiff's evidence all the value to which it is legally entitled, indulging in every legitimate inference which may be drawn from that evidence, the result is a determination that there is no evidence of sufficient substantiality to support a verdict in favor of plaintiff" (*Carpenter* v. *Atchison T. & S. F. Ry. Co.*, 109 Cal.App.2d 18, 23 [240 P.2d 5]). In the light of the foregoing rule the following is a fair summary of the pertinent facts. Our task in this respect has not been made easier by the failure of appellant's counsel to support their statements by appropriate references to the record (Rule 15 (a).)

Plaintiff, 10 years old, entered defendant hospital in mid-afternoon of December 26, 1955. She was assigned to the second floor and placed in a hospital bed of standard size equipped with side rails extending about 15 inches above the bed. Three nurses, all assigned to the 3 p.m.-11 p.m. shift were on duty. Of these three, Nurse Sallee was in charge and, although licensed and registered in Idaho, she had not yet

received her license under this state's reciprócity law; the other two nurses on duty were registered and licensed in California.

There is no record on the temperature and pulse chart that, upon admission, plaintiff's pulse was taken. However, later she was given a physical examination by Dr. Martin, her anesthesiologist, who prescribed the following preoperative medication: one and one-half grains of nembutal to be administered at the hour of sleep, and again at 6 a.m., three-fourths of a grain to be repeated if needed; 50 milligrams of demoral and one one-fiftieth grain of atropine at 7 a.m. At 9:15 p.m., Nurse Sallee administered the first dosage of nembutal.

At 11 o'clock, Nurse Detter came on duty. She was registered in Great Britain, but not in California and had been employed by defendant since 1951, during which time she had been regularly giving injections. At 11:10 p. m., finding plaintiff outside her room, she put her back in bed; at 11:30 p.m., after checking Dr. Martin's preoperative orders, she gave plaintiff three-fourths of a grain of nembutal. Plaintiff's pulse and temperature were not taken thereafter, but Nurse Detter subsequently advised her night supervisor of the additional medication administered. Between 5:30 a.m. and 6 a.m., plaintiff was taken to the bathroom by an attendant nurse after first being clothed with a cap and gown for surgery; at that time she was sleepy and under sedation. Upon being returned to her bed, the side rails were put up. At 6 o'clock, plaintiff was awake and Nurse Detter gave her a grain and a half of nembutal. At 6:15, she was still awake and talked to the night supervisor. At 7, plaintiff appeared to be asleep again and Nurse Detter then injected intramuscularly the prescribed dosages of demoral and atropine. Plaintiff was not awakened although her muscles reacted to the stimulus. When Nurse Detter last saw plaintiff at 7 a.m., she was under the influence of hypnotics and appeared to be asleep.

At 7:15 plaintiff's temperature was taken by a registered nurse who had just come on duty; she was then sleeping quietly, her color was good, and she was breathing normally. At approximately the same time her pulse was taken by another registered nurse who described her condition as normal for a patient under preoperative medication. Plaintiff's pulse was noted to be 104, which, according to the nurse, was within normal range under the circumstances, and she did not report the fact to her supervisor. Both of these registered nurses

testified that the bed's side rails were up, as did plaintiff's father who looked into his daughter's room and stated that she did not appear to be restless.

At 7:23 a.m., plaintiff fell out of her bed, sustaining a lineal fracture of the jaw. When plaintiff was found on the floor the side rails of her bed were still up. She testified that when she returned from the bathroom at 6 o'clock a.m., she went back to sleep and could recall nothing, including the fall, until 8 o'clock. Dr. Martin examined plaintiff at 7:35 a.m., and stated she was then conscious, although sedated, and responded to his questions. He further testified that he did not observe any condition which indicated that plaintiff had any side effects from the medication administered, such as reaction, allergy or susceptibility. At 11:40 a.m., however, his progress report disclosing that plaintiff was then complaining of headache and seeing double "which is not incompatible with a hangover from medication, however it could be due to the fall." The hospital records also included an entry by another doctor that immediately after the fall plaintiff complained of double vision.

The chief contentions urged by appellant concern the sufficiency of the evidence, aided by the doctrine of res ipsa loquitur, to support a judgment in her favor; and error by the trial court in refusing proffered instructions on the care required of respondent hospital and the application thereto of res ipsa loquitur. Supportive of her claims that the evidence was sufficient to sustain a verdict against respondent, appellant argues that the hospital was guilty of negligence as a matter of law in violating certain statutes governing the nursing profession and the administration of narcotic and hypnotic drugs; and that jury questions were raised by evidence establishing, or tending to establish, that respondent and its employees failed to furnish the care and facilities commensurate to her needs.

We first consider whether the law prohibits the furnishing of drugs by nurses in the category of Nurses Sallee and Detter. Section 2725, Business and Professions Code, defines the practice of nursing as "the performing of professional services requiring technical skills and specific knowledge . . . acquired in an accredited school . . . and practiced in conjunction with curative and preventive medicine as prescribed by a licensed physician and the application of such nursing procedures as involve understanding cause and effect in order to safeguard life and health of a patient and

others." It is therein further declared that "(A professional nurse . . . is a person who has met all the legal requirements for licensing as a registered nurse in the State . . ." Section 2732 of the same code provides that no person shall practice nursing as defined by section 2725 without a license. Next, and with reference to the control of hypnotic drugs (nembutal being in that category) by a hospital not employing a pharmacist, section 4225, Business and Professions Code, specifies that "(t)he supply is to be made available to a registered nurse, for administration, on the order or direction of a physician to patients registered in the hospital, or to emergency cases under treatment in the hospital." Appellant contends that by virtue of the foregoing statutes only a California registered nurse could administer the drugs prescribed for her, and neither Nurse Sallee nor Nurse Detter having been licensed in this state, both were guilty of negligence *per se*.

Without going further into the matter of whether both nurses technically may have violated one or more statutes by the administration of the drugs prescribed, it does not follow that if such violation be deemed to exist, it must be considered as negligence *per se*. ▉ While it is elementary that an act in violation of a statute is negligence as a matter of law, it is also established that unusual conditions may be shown to excuse or justify the violation. "Each violation must be considered in connection with the surrounding circumstances" (*Curtis* v. *Q. R. S. Neon Corp. Ltd.*, 147 Cal.App.2d 186, 189, 195 [305 P.2d 294]). ▉ In *Alarid* v. *Vanier*, 50 Cal.2d 617, 624 [327 P.2d 897], the Supreme Court recently restated the rule as follows: "In our opinion the correct test is whether the person who has violated a statute has sustained the burden of showing that he did what might reasonably be expected of a person of ordinary prudence, acting under similar circumstances, who desired to comply with the law." ▉ Whether such violation was excusable under the circumstances ordinarily presents a question of fact for the jury except in a case where reasonable men can draw but one inference from the facts (*Figlia* v. *Wisner*, 150 Cal.App.2d 109, 112 [309 P.2d 832]).

▉ Nurse Sallee, who administered the first dosage of nembutal, was registered in Idaho; Nurse Detter, who furnished the remainder of the preoperative medication, had been registered in Great Britain since 1931 and had given many injections of the type in question. Dr. Martin, without specifying that his statement was limited to California registered

nurses, testified that it was standard practice in the community for nurses to give medication pursuant to doctors' orders. However, the doctrine of customary usage does not apply to the question of legal duty under the law of negligence (*Robinet* v. *Hawks,* 200 Cal. 265, 274 [252 P. 1045]).

As further stated in *Hurtel* v. *Albert Cohn, Inc.,* 5 Cal.2d 145, 148 [52 P.2d 922] : ''We do not think that an established use or custom among men engaged in the same line of work can avail as against the positive requirements of the ordinance, or statute''; in other words, although evidence is admissible to establish whether the degree of care, skill and diligence exercised by a hospital and its attendants is the same as that generally exercised by hospitals in the same community (*Thomas* v. *Seaside Memorial Hospital,* 80 Cal.App.2d 841, 848 [183 P.2d 288]), the customary practice in such community must not be violative of an applicable statute. Assuming that in the record before us no circumstances are present justifying the inference of sufficient excuse for the violation contended, we proceed with the controlling element of proximate cause.

It is well established that before the violation of a statute creates any liability, it must be the proximate cause of the injury complained of (*Hickenbottom* v. *Jeppesen,* 114 Cal.App.2d 115, 120 [300 P.2d 689] ; *Satterlee* v. *Orange Glenn School Dist.,* 29 Cal.2d 581, 590 [177 P.2d 279]). This principle also applies to cases involving the failure to obtain a license (35 Cal.Jur.2d 509). As to this particular phase of the appeal, there is no reason to believe that there would have been less likelihood of injury to appellant had both Nurses Sallee and Detter been licensed in California; at least there is no evidence in the record before us that the results would have been otherwise. The law in California appears to be unchanged since the early malpractice case of *Bute* v. *Potts* (1888), 76 Cal. 304 [18 P. 329]. There the defendant physician was unlicensed and the court declared: ''The fact that he had or had not certificates and diplomas as a physician and surgeon is no proof either that he had skill as such or lacked it. A certificate or diploma could be no proof that he acted with skill in attending a given patient, or that he did not so act. His services as to skill or the contrary must be determined by his acts and conduct in attending the patient. It is the manner in which the services are performed that is the test of their character.'' In *Brown* v. *Shyne* (1926), 242 N.Y. 176, 179 [151 N.E. 197, 198, 44 A.L.R. 1407], the plaintiff recovered a judgment for damages allegedly sustained at

the hands of an unlicensed chiropractor. The Court of Appeals in reversing it stated: "If violation of the statute has no direct bearing on the injury, proof of the violation becomes irrelevant. For injury caused by the neglect of duty imposed by the penal law there is civil remedy; but, of course, the injury must follow from the neglect." In *Janssen* v. *Mulder*, 232 Mich. 183 [205 N.W. 159], it was held that while the failure to comply with a licensing statute, might subject a chiropractor to criminal prosecution, such a failure is not sufficient to support a charge of malpractice absent a showing that the result complained of was due to negligence or unskilled treatment. To the same general effect is *Martin* v. *Carbide & Carbon Chemicals Corp.* (1946), 184 Tenn. 166 [197 S.W.2d 798]. In *Levy* v. *Vaughan* (1914), 42 App. D.C. 146, the court affirmed a directed verdict for the defendant and held, among other things, that there was no negligence in permitting the anesthetic (ether) to be administered by an advanced medical student as long as there was some form of supervision. Expert testimony established that such practice was customary in the District of Columbia; furthermore, in the court's opinion it was immaterial that the supervising physicians were not licensed in the District since the possession of such a license would not have added to their competency as doctors.

Appellant has presented nothing to distinguish her case from the rules and reasoning found in the foregoing decisions except the reassertion that it was for the jury to decide whether the administration of the prescribed drugs by an unlicensed California registered nurse proximately contributed to her injuries. ▮▮▮ Whether such causation exists is a question of fact except when reasonable men can draw but one inference from the facts (*Figlia* v. *Wisner*, 150 Cal.App.2d 109, 112 [309 P.2d 832]) or, as has been stated, unless there exists reasonable grounds for the belief that the violation was a proximate cause of the injury (*Green* v. *Menveg Properties, Inc.*, 126 Cal.App.2d 1, 11 [271 P.2d 544]). ▮▮▮ It is not suggested that the actual administration of the medication was negligently performed or that such administration by a licensed nurse would have effected a different result. Appellant calls attention to a statement in *Biakanja* v. *Irving*, 49 Cal.2d 647, 651 [320 P.2d 16], reliance on which appears to be misplaced. The action there involved a damage suit against a notary public for drawing an invalid will, and the court observed that the drawing

of wills required specialized skills which the defendant did not possess. The statement by the court that defendant "engaged in the unauthorized practice of the law" appears to be dictum, incidental to the result reached.

 Related to the matters just discussed and determined is appellant's additional claim that respondent was negligent in its selection of unlicensed nurses to administer dangerous drugs and that it negligently supervised these employees whose alleged inaction in the presence of danger signals proximately caused the injuries sustained. There is authority generally for the first of the foregoing contentions; thus, liability may attach to a hospital if it negligently employs an incapable nurse through whose carelessness or lack of ability in the course of her duties the patient is injured (*England* v. *Hospital of Good Samaritan,* 16 Cal. App.2d 640, 644 [61 P.2d 48].) However, the facts of each case must be judged according to their own merits, and the situation in the England case is hardly comparable, it there appearing that the defendant hospital failed to check the references in the nurse's application for employment, and the pertinent public records showed that her application for registration as a nurse had been rejected.

 As to appellant's second contention, respondent was obliged to furnish her with the services and care of competent nurses possessing that degree of skill and learning customarily applied in the same community (*Valentin* v. *La Societe Francaise,* 76 Cal.App.2d 1, 4-5 [172 P.2d 359]), proof of which is usually made by expert testimony (*Perkins* v. *Trueblood,* 180 Cal. 437, 443 [181 P. 642]), and such care and diligence must be measured by the capacity of the patient to care for herself (*Valentin* v. *La Societe Francaise, supra,* p. 4), but limited by the rule that no one is required to guard against or take measures to avert that which a reasonable person under the circumstances would not anticipate as likely to happen. (*Wood* v. *Samaritan Institution, Inc.,* 26 Cal.2d 847, 852 [161 P.2d 556]).

 There can hardly be any doubt that appellant possessed some special susceptibility either to the drugs administered or to the dosage prescribed. The claim is advanced that there was evidence forewarning respondent's employees which would have moved a reasonably intelligent attendant to take necessary precautions to prevent what thereafter occurred. Dr. Martin, who was not named as a defendant,

testified that he examined appellant before the preoperative medication was prescribed, checked her history, looked at her throat, listened to her heart and lungs, and took her blood pressure and pulse. He found that she was apprehensive and jittery, but otherwise perfectly normal. Edna Toutz, a California registered nurse, stated that it is not ordinary and customary practice in hospitals to take a child's pulse on admission because the variation is so great that it would not be significant in the case of a tonsillectomy. She further testified that she took appellant's pulse at 7:15 a.m., and did not report the fact it was 104 because a child's pulse varies more than an adult's, and appellant's pulse was within normal range in view of the anesthetic state in which she had been placed. Norma Ford, also a California registered nurse, stated that the preoperative medication was the standard, normal preoperative medication for a patient of appellant's age and size. This view was concurred in by Dr. Martin, who also gave the following testimony: that his medication orders had been carried out; that a pulse of 104 for a child of appellant's age and weight and with preoperative medication is not unusual and within normal limits and that the medication given was standard for a person in appellant's age and weight category; that the side rails on appellant's bed were standard size and that it was customary practice to place a child of appellant's age in a regular bed, rather than in a crib or small bed; that the side rails should be kept up—(there is no claim that such precaution was not taken)—and if the patient shows any tendency to become disturbed, she should be watched but not restrained (to physically restrain a person would make him wilder), that he relied on the nurses to adhere to such practices and that he would not have administered an additional dosage of nembutal if appellant had exhibited any excitement or manifested an allergic reaction thereto. No expert testimony was introduced to negative the foregoing.

Based on the above facts, and other evidence either already narrated or of a cumulative character not necessary here to summarize, appellant argues that despite "all the classic signs of a drug reaction" respondent's employees administered an excessive dosage of drugs, sufficient to "trigger" a latent susceptibility thereto; if not, they had notice or knowledge of facts reasonably indicating that she would be likely to harm herself unless preclusive measures were taken. Neither contention, in our opinion, has merit. ■■■ A private

hospital is not an insurer of a patient's safety (*Gray* v. *Carter*, 100 Cal.App.2d 642, 644 [224 P.2d 28].)　Reiterating what was heretofore said with respect to the. alleged negligence in the actual administration of the drugs, there is nothing by way of expert testimony or otherwise that a California registered nurse would have been more constant and skillful in observing appellant for symptoms indicating that too much anesthetic was being given, either by way of additional nembutal at 6 a. m., or atropine and demoral by way of intramuscular injection at 7 a. m. Too, only eight minutes elapsed between 7:15 a. m. when appellant was observed to be sleeping quietly with the bed rails up and her fall from the bed which occurred at 7:23 a. m. The record does not support appellant's claim that she theretofore displayed "all the classic symptoms of a drug reaction." The situation is far different from that in *Valentin* v. *La Societe Francaise, supra,* 76 Cal.App.2d 1, where the danger signals, indicating the onset of tetanus, continued for a period of several hours. Also distinguishable is *Thomas* v. *Seaside Memorial Hospital, supra,* 80 Cal.App.2d 841, which involved the failure to maintain proper vigilance over an 8-month-old baby following minor surgery, the nurse responsible therefor being absent for 15 minutes. Furthermore, in each of the foregoing cases, expert testimony was elicited to establish a standard of care. On the other hand, language and reasoning are found in *Gray* v. *Carter, supra,* 100 Cal.App.2d 642, which seems determinative, even though the plaintiff there was not a minor under anesthesia. That case was followed in *Ericson* v. *Petersen,* 116 Cal.App.2d 106 [253 P.2d 99], where the Supreme Court denied a hearing.　Both cases stand for the proposition that a hospital may not be held liable in the absence of evidence which would support an inference that the hospital or its servants are chargeable with knowledge of any sudden change in a patient's mental condition sufficient to forewarn them that the patient was likely to fall from the bed. Appellant here did not contract for special nurses furnishing constant bedside attention, and a hospital is liable only for want of ordinary care (*Welsh* v. *Mercy Hospital,* 65 Cal.App.2d 473, 478 [151 P.2d 17]).　The record, we conclude, is barren of evidence which would support a judgment in appellant's favor on the theories hereinbefore discussed.

　Likewise without merit is the contention that liability

arose by virtue of respondent's failure to keep proper hospital records; specifically, its omission to take and record appellant's pulse and temperature upon her admission. We are asked in that respect to take judicial notice of Hospital Licensing Regulation Number 280, which assertedly governs. Again, however, any alleged violation of such a regulation becomes immaterial unless appellant can show that the same was a proximate cause of her injuries. In *Costa* v. *Regents of University of California,* 116 Cal.App.2d 445, 461 [254 P.2d 85], it was stated: "The allegedly negligent handling of defendants' hospital records which according to appellant made them unreliable concededly had not been a proximate cause of the injury for which the action was brought." It is not suggested, nor must it be overlooked, that Dr. Martin made an examination of appellant immediately prior to prescribing the medication administered, and the maintenance of records consistent with the requirements of the regulation would not, as appellant argues, have indicated that she had an abnormal pulse; indeed, the evidence was to the effect that a pulse of 104 was normal and within proper range under the then circumstances.

Appellant's next contention that she established a prima facie case by evidence which was sufficient to invoke in her favor the doctrine of res ipsa loquitur is a decisive one. ■ The elements essential to the application of res ipsa loquitur, well settled by the decisions, are summarized in *Snyder* v. *Hollingbery,* 141 Cal.App.2d 520, at page 528 [297 P.2d 485]: "(a) There is a basis of experience, either common to the community or brought out in evidence, from which it may reasonably be concluded that the accident is of a kind which does not normally occur unless someone has been negligent. (b) It must be caused by an agency or instrumentality within the exclusive control of the defendant. (c) It must not have been due to any voluntary action or contribution on the part of the plaintiff." (*Wolfsmith* v. *Marsh,* 51 Cal.2d 832 [337 P.2d 70]; *Cavero* v. *Franklin etc. Benevolent Soc.,* 36 Cal.2d 301 [223 P.2d 471]; *Ybarra* v. *Spangard,* 25 Cal.2d 486 [154 P.2d 687, 162 A.L.R. 1258]; *Bauer* v. *Otis,* 133 Cal.App.2d 439 [284 P.2d 133].)

In this case, conditions (b) and (c), *supra,* were obviously present and respondent does not appear to contend otherwise. The question is: Was (a) also present? ■ "As a general rule, res ipsa loquitur is applicable where it appears

that the accident is of such a nature that it can be said, in the light of past experience, that it *probably* was the result of negligence by someone and that the defendant is *probably* the one who is responsible." (*Stanford* v. *Richmond Chase Co.,* 43 Cal.2d 287, 292 [272 P.2d 764]), quoting from *Zentz* v. *Coca Cola Bottling Co.,* 39 Cal.2d 436, 442-443 [247 P.2d 344]). Dean Prosser has observed in 37 California Law Review, at page 195: "The more recent decisions . . . have held that the inference is not required to be an exclusive or compelling one. It is enough that the court cannot say that reasonable men could not draw it." Only in a restrictive class of cases was the doctrine of res ipsa loquitur first applied in malpractice actions, and then in obvious situations where sponges or surgical instruments were left inside a patient, etc. In each, the application was allowed because common knowledge and experience teaches that the result was one which would not have occurred had due care been exercised. The doctrine was rejected where medical evidence was required to show not only what occurred but how and why it occurred (*Engelking* v. *Carlson,* 13 Cal.2d 216 [88 P.2d 695]). Later, the doctrine was extended to a plaintiff unconscious from anesthesia during an appendectomy, who suffered traumatic injury to his shoulder, a healthy part of the body outside the area of surgery, which a layman could say would not have occurred in the absence of negligence, although expert testimony was received showing the cause of plaintiff's condition to be trauma by pressure or strain applied between the right shoulder and neck and not arising from pathological causes and not systemic (*Ybarra* v. *Spangard,* 25 Cal.2d 486 [154 P.2d 687, 162 A.L.R. 1258]). When an injury of that character occurs, the court reasoned, it is within a layman's common knowledge that someone's negligence was probably the contributing cause. The Ybarra case further liberalized the rule as follows: While the patient is unconscious, the exclusive control requirement included "collective control" or the right to control. The group having the right to control has the burden of giving an exculpatory explanation to avoid the inference of negligence since they are in a better position to explain than the plaintiff. In *Dierman* v. *Providence Hospital,* 31 Cal.2d 290 [188 P.2d 12], the court upheld the application of res ipsa loquitur where a general anesthetic exploded while the doctor was using an electric needle to cauterize a wound. Although

the probability of defendant's negligence was there speculative, the court reasoned that the evidence as to cause was in control of the doctor, and his failure to produce the evidence justified a presumption that such evidence was adverse. At page 295, the court said: "It is not to say that a defendant must in every case produce evidence of the actual cause of the accident. It is not to say that the question of the sufficiency of a defendant's explanation—of, if he cannot explain, the sufficiency of his evidence of due care and of impossibility of explanation—is not ordinarily for the jury . . . the defendant will not be held blameless except upon a showing either (1) of a satisfactory explanation of the accident, that is, an affirmative showing of a definite cause for the accident, in which cause no element of negligence on the part of the defendant adheres, or (2) of such care in all possible respects as necessarily to lead to the conclusion that the accident could not have happened from want of care, but must have been due to some unpreventable cause, although the exact cause is unknown. In the latter case, inasmuch as the process of reasoning is one of exclusion, the care shown must be satisfactory in the sense that it covers all causes which due care on the part of defendant might have prevented."

Still our courts were reluctant to apply the doctrine of res ipsa loquitur under conditions in which medical testimony was given, the inference based on common knowledge being at the root of the res ipsa loquitur doctrine. (*Moore* v. *Belt,* 34 Cal.2d 525 [212 P.2d 509].) However, in *Cavero* v. *Franklin etc. Benevolent Soc.,* 36 Cal.2d 301 [223 P.2d 471], a case involving the death of a child during a tonsillectomy while under the influence of an anesthetic, "there was no suggestion at the trial that plaintiff's son died as the result of a preexisting condition, whether pathological or systemic in nature. The expert evidence was to the contrary, and in this respect is wholly uncontradicted. It shows that, except for infected tonsils and adenoids, and a slight temperature due to such infection, the child was normal and healthy, and the tonsillectomy was not a major operation, nor performed as an emergency. Dr. Nellie Null, as heretofore stated, testified that in her forty years of practice she had performed 'hundreds of these tonsillectomies,' and that this was 'the first case in which a death has ever occurred in one of' them." In applying the doctrine, the Supreme Court stated: "Under the circumstances shown we hold tenable plaintiff's position that the evidence *prima facie* established,

in the absence of explanation, that 'the child's death was due to something which ordinarily does not occur in the absence of negligence, that it was caused by an agency or instrumentality within the control of defendants, and that it was not due to any (legally material) voluntary action or contribution on the part of either plaintiff or the child,' and, consequently, that the res ipsa loquitur instruction was properly given.'' (P. 311.)

Thereafter in *Bauer* v. *Otis*, 133 Cal.App.2d 439 [284 P.2d 133], plaintiff, while under treatment for neuritis, was administered an injection of Thex in his right arm, immediately resulting in a ''wristdrop.'' The court reversed a judgment in favor of both the doctor and nurse because of the lower court's failure to give an instruction on res ipsa loquitur and stated, at page 443: ''While injections and the use of Thex are primarily medical matters, it is a matter of common knowledge among the laymen that injections in the muscles of the arm, as well as other portions of the body, do not cause trouble unless unskillfully done or unless there is something wrong with the serum . . . if something does go wrong it is a matter of explanation by the person causing the injury.'' In *Cavero* v. *Franklin etc. Benevolent Soc., supra*, 36 Cal.2d 301 [223 P.2d 471], it was likewise stated to be a matter of common knowledge that anesthesia properly applied causes no injury. In *Bauer* v. *Otis, supra*, 133 Cal.App.2d 439, expert testimony was given in the court below, and two doctors gave testimony that contradicted another as to common medical knowledge. The court, holding that this merely created a conflict of testimony for the jury to resolve, stated at page 445: ''The court in giving res ipsa loquitur instructions could have qualified them by instructing the jury that if it should find that common medical knowledge was contrary to common layman knowledge, namely, that the injury here could have resulted without negligence, then it must not apply the doctrine.''

Now it is well established that '' (I)n determining whether an accident was of such a nature that it probably was the result of negligence by someone, the courts have relied upon both (a) common knowledge and (b) the testimony of expert witnesses, as well as the circumstances relating to the accident in each particular case. (*Zentz* v. *Coca Cola Bottling Co.*, 39 Cal.2d 436, 446 [13], [14] [247 P.2d 344]; *Bauer* v. *Otis, supra*, page 443.)'' *Wolfsmith* v. *Marsh*, 51 Cal.2d 832, at page 835 [337 P.2d 70].

We reiterate that Dr. Martin was not named a defendant, and appellant does not claim that he was acting as respondent's agent. Under the theory of "collective control" however, as well as the doctor's statement that he "relied" on them to maintain proper surveillance over his anesthetized patient, the duty devolved on respondent's nurses to adhere to the standard of care required; but the rules of the *Dierman* case are applicable to them only. After a careful examination of the record, we do not believe that respondent has shown that its care of appellant was "satisfactory in the sense that it covers all causes which due care on the part of defendant might have prevented." (*Dierman* v. *Providence Hospital, supra,* 31 Cal.2d 290, 295.) No explanation was given by anyone as to the actual cause of the accident. As in *Cavero* v. *Franklin etc. Benevolent Soc., supra,* 36 Cal.2d 301, there was no suggestion by respondent here that appellant suffered from any preexisting condition; on the contrary, Dr. Martin stated that except for infected tonsils and adenoids, the child was normal and healthy. He also testified that the responsibility for administering the drugs was in effect coequal with his duty in that respect. Furthermore, an inference can readily be drawn from the testimony of the nurses that the accident suffered by appellant was rare, if not unprecedented.

Although wisely stated in *Salgo* v. *Leland Stanford etc. Board of Trustees,* 154 Cal.App.2d 560, at page 569 [317 P.2d 170] that: "The great difficulty in the application of the doctrine is to determine where to draw the line," we feel that the Wolfsmith, Cavero and Bauer cases are controlling here. Interestingly enough, of the numerous cases cited and discussed at length by respondent on the issue of res ipsa loquitur, it has avoided any mention of these authorities. Respondent claims that *Seneris* v. *Haas,* 45 Cal.2d 811 [291 P.2d 915, 53 A.L.R.2d 124], holds that the problem here presented could be resolved only by expert tsetimony; to the contrary, that case holds (pp. 824-825) that the doctrine of res ipsa loquitur is applied where it is a matter of common knowledge among laymen, or medical men, or both, that the injury could not have occurred without negligence.

It appears to us that the jury should have been permitted to decide whether proper preclusive measures were taken in the light of the circumstances at bar. Citing *Seneris* v. *Haas,* 45 Cal.2d 811, page 827 [291 P.2d 915, 53 A.L.R.2d 124], the Supreme Court in *Wolfsmith* v. *Marsh,* 51 Cal.2d

832, at pages 835-836 [337 P.2d 70], said: "The conclusion that negligence is the most likely explanation of an accident or injury is not for the trial court to draw or refuse to draw so long as plaintiff has produced sufficient evidence to permit the jury to draw the inference of negligence, though the court itself would not draw that inference. The court must leave the question to the jury where reasonable men may differ as to the balance of probabilities."

Appellant's final contention relates to the trial court's refusal to give a proffered instruction based on the doctrine of res ipsa loquitur. Since we have determined that the doctrine is here applicable, it was error for the court so to do.

For the foregoing reasons, the judgment is reversed.

White, P. J., concurred.

Fourt, J., dissented.

Respondent's petition for a hearing by the Supreme Court was denied June 24, 1959.