470 P.2d 703

**Jay B. KLEINMAN and Gwen Kleinman, husband and wife, Appellants,**

v.

**Paul S. ARMOUR, M.D., Appellee.**

**No. I CA–CIV 935.**

Court of Appeals of Arizona, Division 1, Department B.

June 22, 1970.

---

Alan M. Kyman, Phoenix, for appellants.

Anderson & Holloway, by Paul W. Holloway, Phoenix, for appellee.

HAIRE, Judge.

In this medical malpractice action, the trial court entered judgment on a directed verdict for the defendant doctor at the close of plaintiffs' case. Plaintiffs have appealed, contending that " * * * the medical malpractice * * * was so obvious as to be determinable by laymen, and as a result thereof, the direction of a verdict and granting of a judgment thereon constituted an abuse of discretion."

█ While as a general rule, negligence in the form of medical malpractice must be established by expert medical testimony, Boyce v. Brown, 51 Ariz. 416, 77 P.2d 455 (1938); Butler v. Rule, 29 Ariz. 405, 242 P. 436 (1926); Stallcup v. Coscarart, 79 Ariz. 42, 282 P.2d 791 (1955); Vigil v. Herman, 102 Ariz. 31, 424 P.2d 159 (1967), it is well recognized that expert testimony is not required where the resolution of the question to be determined does not require special and technical knowledge of the medical profession, and is so grossly apparent that the average layman would have no difficulty in recognizing it. Revels v. Pohle, 101 Ariz. 208, 418 P.2d 364 (1966); and Boyce v. Brown, supra. In order to determine whether this exception applies to defendant's conduct in this case, it is first necessary to ascertain just what conduct on defendant's part is alleged to constitute medical malpractice.

Appellants (Mr. and Mrs. Kleinman) set forth two separately numbered paragraphs as questions presented on appeal. These "questions" are quite ambiguously stated, but appellants appear to contend that (1) defendant misinterpreted the result of a pregnancy test using a drug known as Produosterone and therefore negligently diagnosed Mrs. Kleinman as pregnant; and (2) that defendant negligently treated Mrs. Kleinman for a threatened abortion utilizing a certain drug known as Norlutate, when he should have been treating her for a condition known as endometriosis.[1]

The pertinent facts, stated most strongly in favor of the appellants, are as follows:

Plaintiffs Jay and Gwen Kleinman had been married since 1960. During the summer of 1964 they decided to have a second child, and, therefore, Mrs. Kleinman discontinued the birth control pills which she had been taking. Her last menstrual period was on July 13th, and when no period occurred approximately one month later, she sought the professional advice of the defendant, Dr. Armour. He was not available and therefore she talked over the phone with an associate of Dr. Armour who worked in his office during Dr. Armour's absence. A prescription for the drug Produosterone was given to Mrs. Kleinman as an office test to determine pregnancy. This was on August 14, 1964. Mrs. Kleinman had the prescription filled and started taking the drug that day. She had been told to take the drug for three days and if she wasn't pregnant, that her period would begin within 72 hours.

The next day the Kleinmans left on a summer vacation. While on vacation, on August 21st, Mrs. Kleinman noticed a bloody discharge from her vagina. She called a nearby hospital and personnel there advised her to return to Phoenix, which she did, arriving in Phoenix on approximately August 23rd.

An appointment was made with Dr. Armour for August 28th. On this date, Dr. Armour took a history from Mrs. Kleinman, noted the various symptoms involved,

---

1. These contentions are brought into sharper focus in a later portion of appellants' brief, where, after discussing in detail the evidence, the claim is advanced that the evidence preponderates in appellants' favor, showing that " * * * [defendant] apparently misdiagnosed Gwen, treating her to maintain a pregnancy that was nonexistent, instead of treating her for what was really wrong, endometriosis. * * * "

then gave a general pelvic examination for pregnancy. It was his diagnosis that she was "probably pregnant". Because of Mrs. Kleinman's complaints relating to nausea and cramping and some continued vaginal discharge, he gave her an injection for the cramping, and a prescription for the drug Norlutate, a drug to prevent involuntary abortion. This treatment was effective and at that time controlled the cramping and bleeding. Approximately two weeks later, on September 11, 1964, the cramping and bleeding started again, and Mrs. Kleinman telephoned Dr. Armour's office. She was advised to go to Good Samaritan Hospital. There she was treated by a Dr. Hasse who performed a vaginal examination. It was also his diagnosis that she was one and one-half to two months pregnant and that her symptoms indicated a threatened abortion. He instructed her to go home and stay in bed. Mrs. Kleinman continued taking the drug Norlutate, and obtained numerous refills of the original prescription apparently with Dr. Armour's consent and permission, although there is some conflict on this one point.

Mrs. Kleinman maintained that throughout the period of her treatment by Dr. Armour she advised him of pains in the area of her abdomen, although Dr. Armour's records contain no mention of this, nor did he recall Mrs. Kleinman so advising him.

At Mrs. Kleinman's January 8, 1965 appointment with Dr. Armour, he became concerned because a palpable fundus was not found, and an appointment for January 22nd was made. On that date, another pelvic examination was performed and when this did not indicate pregnancy, x-rays were ordered. These proved to be negative, showing no fetal skeleton.

On January 25, 1965, Mrs. Kleinman consulted Dr. Jack Wilson, a specialist in gynecology, to find out what her problem was. He diagnosed her condition as probably an endometriomia of the umbilicus. Dr. Wilson continued treating her for this condition and on July 10, 1965, excised the endometriomia of the umbilicus. He last saw her on August 7, 1965, when her condition had cleared.

As previously stated, appellants primarily contend that the defendant was negligent in diagnosing Mrs. Kleinman as pregnant because the results of the pregnancy test allegedly showed that she was not pregnant, and that these results were so obvious that laymen could clearly determine this negligence without the necessity for expert medical testimony. If all we had involved here on the question of the pregnancy diagnosis was an interpretation of the results of the pregnancy test, then plaintiffs' position might possibly be tenable because arguably the defendant's own testimony did set forth a standard for the interpretation of the test results. Vigil v. Herman, *supra*; Stallcup v. Coscarart, *supra*. Even this would be questionable because the facts establishing the test results were not that definite and certain.[2]

However, the defendant's diagnosis of "probable pregnancy" was based not only upon the test results, but also upon a consideration of the symptoms related to him by Mrs. Kleinman and an actual pelvic examination for pregnancy. Certainly, a layman is in no position to determine that the defendant's diagnosis of probable pregnancy under these circumstances constituted a violation of defendant's duty to exercise that skill and knowledge normally possessed by the average members of his profession in the community. In fact, there is no medical evidence to indicate that defendant's diagnosis of probable pregnancy was not initially correct. The only other medical evidence on this point is Dr. Hasse's subsequent diagnosis, two weeks

2. Contrary to appellants' now asserted conclusions that Mrs. Kleinman's vaginal discharges were her regular menstrual periods, this was not Mrs. Kleinman's opinion at the time of the examinations by the defendant. Further, defendant testified that such vaginal discharges could be an indication of attempted involuntary abortion, and not at all inconsistent with his diagnosis of probable pregnancy.

later, of pregnancy and threatened involuntary abortion, which confirmed the defendant's initial diagnosis.

Appellants' other contention is based upon the assumption that Mrs. Kleinman was not in fact initially pregnant. This contention is that the defendant was negligent in treating Mrs. Kleinman for a threatened abortion with the drug Norlutate, rather than treating her for endometriosis. Here again, we do not believe that the propriety of defendant's conduct in giving the treatment here involved can be determined without recourse to expert medical testimony. The medical testimony of the defendant and plaintiff's witness, Dr. Wilson, is that the treatment was proper for a threatened abortion. Further, the testimony of Dr. Wilson was that the drug Norlutate was at that time recognized as a proper treatment for endometriosis, if we assume that Mrs. Kleinman initially had endometriosis.[3]

From the foregoing we think it is apparent that in this case plaintiffs failed to introduce evidence establishing a standard of required conduct for the guidance of the jury in determining whether defendant's conduct violated that standard. The resolution of the issues here involved, that is, the question of Mrs. Kleinman's pregnancy and the proper treatment therefor, as well as the question concerning the existence of endometriosis and the effect to be given to Mrs. Kleinman's complaints of abdominal pain, are such as to require evidence which is within the special and technical knowledge of the medical profession. The negligent conduct, if any, is not so grossly apparent that the average layman would have no difficulty recognizing it.

Appellants place great reliance upon the decision in Revels v. Pohle, *supra*. In that decision the Arizona Supreme Court held that the defendant physician's complete disregard of the plaintiff's continual complaints of post-operative pain (subsequently discovered to be the result of steel sutures inadvertently left by the defendant doctor in the incision) without any examination in any manner by the defendant over a period of several months, constituted such gross negligence that expert medical testimony was not necessary. The reasoning of Revels v. Pohle is not applicable to the facts presented to the jury in this case. Revels presents a case of the classical type in which the defendant doctor fails to discover a condition caused by him which would have been easily ascertainable upon examination, that is, the existence of the metal sutures. In that case, according to the opinion the defendant doctor had "[failed] to examine the patient in any manner." In contrast, in the case at hand, the defendant initially gave Mrs. Kleinman a thorough pre-natal examination on her first visit, several interim examinations, and a thorough pelvic examination in January 1965. As to Mrs. Kleinman's complaints of abdominal pain, there is no evidence to show that the treatment given was in any way inconsistent with these complaints. There is no evidence that defendant did not examine and treat Mrs. Kleinman in accordance with recognized standards in the community. If her symptoms required that she be examined more often or treated in a different manner, such requirement certainly cannot be said to be so grossly apparent that a layman would have no difficulty in recognizing it.

Because in our opinion plaintiffs failed to establish the requisite standard of care and that defendant's conduct departed therefrom, we do not deem it necessary to discuss defendant's further contention that plaintiffs failed to show that defendant's alleged negligence was the proximate cause of the complained of injury or condition.

The judgment of the trial court is affirmed.

EUBANK, P. J., and JACOBSON, J., concur.

---

3. There is no evidence as to when the endometriosis had its inception.