501 P.2d 440

Margaret FARIS, Appellant,

v.

DOCTORS HOSPITAL, INC., et al.,
Appellees.

No. 1 CA–CIV 1660.

Court of Appeals of Arizona,
Division 1,
Department B.
Sept. 26, 1972.

Rehearing Denied Oct. 26, 1972.

Review Denied Nov. 28, 1972.

cal malpractice case brought by the appellant (plaintiff), Margaret Faris, against the appellees (defendants), Charles R. Nevins, M.D., John T. Peter Hayward-Butt, M.D., and Doctors Hospital. The trial court granted each defendant a separate summary judgment, from which the appellant appealed.

Appellant questions the correctness of granting each summary judgment, and contends, in essence, that where she relies on the doctrine of *res ipsa loquitur,* in the pretrial stage of the proceedings, the inference of negligence raised thereby is sufficient to withstand a motion for summary judgment in that the doctrine itself raises a genuine issue as to a material fact precluding summary judgment and requires that the issue of malpractice proceed to trial. Appellees contend that their summary judgments were proper because of the appellant's failure to produce any expert testimony whatsoever that would support the doctrine of *res ipsa loquitur* in a medical malpractice claim; and consequently they argue that there was no genuine issue as to a material fact regarding the alleged neck injury, in order to go to trial on the issue of malpractice. Countering this, appellant admits the lack of expert testimony, but contends that such evidence is unnecessary because of an admission against interest made by Dr. Nevins and because of her raising the doctrine of *res ipsa loquitur.*

Duecy, Moore, Petsch & Robinson, Scottsdale by J. William Moore, Phoenix, and Lewis B. Moore, Jr., Scottsdale, for appellant.

Jack M. Anderson, Phoenix, for appellee Doctors Hospital, Inc.

Snell & Wilmer by Loren W. Counce, Jr., Phoenix, for appellee Nevins, M.D.

O'Connor, Cavanagh, Anderson, Westover, Killingsworth & Beshears by Richard J. Woods, Phoenix, for appellee Hayward-Butt, M.D.

EUBANK, Judge.

This appeal involves the application of the doctrine of *res ipsa loquitur* in a medi-

The facts are as follows: The appellant, who is a registered nurse, was a patient of the appellee Dr. Nevins. On June 24, 1968, she was admitted to Doctors Hospital for a hysterectomy and the repair of a ventral hernia. This surgery was performed by Dr. Nevins on the following day. The appellant's recovery was good until June 30, when, according to the hospital record, bleeding was discovered emanating from the lower incision following a coughing spell. On July 1, appellant complained of pain in the pelvic region and following an examination, Dr. Nevins discovered an infection which required drainage. On July 3, Dr. Nevins, assisted by

appellee Hayward-Butt as anesthesiologist, again operated on the appellant at Doctors Hospital, draining the abscess. The operation was successful, but appellant claims that immediately upon regaining consciousness, she began to experience pain in her cervical spine (neck) area which radiated into her shoulder and arms. Appellant testified she had not experienced this pain prior to the July 3 operation. The progress records of the doctors, nurses and hospital reveal no complaint of neck pain by the appellant until July 6, three days after the operation. Dr. Nevins testified by deposition that following the operation on July 3, he left town leaving the appellant under the care of Dr. Dagres. When Dr. Nevins returned to the hospital on July 7, the appellant complained to him of the neck pain and, in her deposition, reports Dr. Nevins as stating to her:

". . . Margaret, I am almost sure this accident didn't happen while you were being moved from side to side. I am inclined to believe that your head and neck were hyperextended."

When asked about making this statement, Dr. Nevins testified that he didn't remember making it. Dr. Nevins testified that on learning of the neck problem on July 7, he immediately referred the appellant to Dr. William V. Ergenbright, an orthopedic surgeon. Dr. Ergenbright had performed a laminectomy on the appellant in 1954 removing a ruptured disk between L–5 and S–1 on the left side, which was caused by "disk degeneration". The appellant had been Dr. Ergenbright's patient from then through 1968 with complaints relating to degenerative disk disease primarily in the lower back. In 1962, his office noted neck complaints by appellant which were diagnosed as a degenerative change in the cervical spine level. Dr. Ergenbright examined the appellant on July 8, 1968, and determined by X-rays that a thinning of the disk space between C–5 and C–6 vertebrae had occurred. He testified that the significance of this change was as follows:

"It would mean that the disk material in that level had degenerated, and that the space, the degeneration of the intervertebral disk material allows the cervical vertebra to come closer together."

He further testified that the cause of the thinning disk space was related to the aging process and that he did not know what the actual cause of the appellant's complaint was but that such complaints were not necessarily related to trauma but were related to the degenerative process itself.

Dr. Harry A. Danielson, a neurological surgeon who performed the operation on appellant's neck on July 29, and confirmed the diagnosis of a herniation of disk material between C–5 and C–6 vertebrae, testified by deposition that appellant's cervical spine was undergoing "advanced degenerative changes when the foramina became narrowed" and that coughing, sneezing or merely awakening in the morning could cause appellant's disk herniation.

The appellee, Dr. John Hayward-Butt, testified by deposition that he reviewed the file and consulted with specialists and that in his opinion:

". . . A disk can become extruded from no force whatever, from the merest apparent triviality.

To repeat my quips of sneezing, coughing and even rolling over in bed. There is no necessity to have an external force to protrude a disk."

He also testified that he did not hyperextend the appellant's neck for the purpose of administering anesthesia and that her condition would not have resulted from such a procedure in any case.

Dr. Charles Nevins testified that he was not aware that appellant's neck was hyperextended during the July 3 operation.

■ In reviewing a summary judgment on appeal, we must, of course, view the evidence in a light most favorable to the appellant and give her the benefit of all inferences reasonably drawn therefrom. Livingston v. Citizen's Utility, Inc., 107

Ariz. 62, 481 P.2d 855 (1971). However, first we must determine whether under the facts of this case the doctrine of *res ipsa loquitur* is applicable, and if not, whether the inference requested by the appellant to be drawn from Dr. Nevins' purported statement to her that, "I am inclined to believe that your head and neck were hyperextended.", is sufficient to establish that her neck was hyperextended, and whether this satisfies the need for expert testimony on the standard of care.

■ An excellent summary of the doctrine of *res ipsa loquitur* is set out in O'Donnell v. Maves, 103 Ariz. 28, 436 P.2d 577 (1968), where our Supreme Court, in essence, said that the doctrine is essentially a rule of circumstantial evidence where a jury in a negligence case is permitted but not required to draw an inference of negligence from the happening of an accident of a kind which experience has shown does not normally occur if due care is exercised. *See also,* M. Udall, Arizona Law of Evidence, § 195, p. 436 (1960). The Court in O'Donnell, supra, also restated the conditions necessary for the application of the doctrine as follows:

" '(1) [T]he accident must be of a kind which ordinarily does not occur in the absence of some one's negligence;

(2) it must be caused by an agency or instrumentality within the exclusive control of defendant;

(3) it must not have been due to any voluntary action on the part of the plaintiff;

(4) plaintiff must not be in a position to show the particular circumstances which caused the offending agency or instrumentality to operate to his injury . . .' " (original emphasis) (103 Ariz. at 30, 436 P.2d at 579).

■ The first question is whether the doctrine of *res ipsa loquitur* is even applicable to a medical malpractice case brought against the doctors or the hospital. We answer this question in the affirmative.

The relationship between *res ipsa loquitur* and medical malpractice is placed in historical context in an excellent opinion by the California Court of Appeals in Salgo v. Leland Stanford Jr. University Board of Trustees, 154 Cal.App.2d 560, 317 P.2d 170 (1957), where the Court said:

"The application of the doctrine of res ipsa loquitur in malpractice cases is a development of comparatively recent years. Before that time, the facts that medicine is not an exact science, that the human body is not susceptible to precise understanding, that the care required of a medical man is the degree of learning and skill common in his profession or locality, and that even with the greatest of care untoward results do occur in surgical and medical procedures, were considered paramount in determining whether the medical man in a given circumstance had been negligent. But gradually the courts awoke to the so-called 'conspiracy of silence.' No matter how lacking in skill or how negligent the medical man might be, it was almost impossible to get other medical men to testify adversely to him in litigation based on his alleged negligence. Not only would the guilty person thereby escape from civil liability for the wrong he had done, but his professional colleagues would take no steps to insure that the same results would not again occur at his hands. This fact, plus the fact that usually the patient is by reason of anesthesia or lack of medical knowledge in no position to know what occurred that resulted in harm to him, forced the courts to attempt to equalize the situation by in some cases placing the burden on the doctor of explaining what occurred in order to overcome an inference of negligence. One other fact contributed to the application of the doctrine, namely, that certain medical and surgical procedures became so common that in many of them the laymen knew that if properly conducted untoward results did not occur,[5] [5. Such a procedure is injection in the muscles of the arm. See Bauer v. Otis, 133 Cal.App.2d

439, 443–445, 284 P.2d 133.] and in others medical men (when it was possible to get them to admit it) from their specialized knowledge knew that without negligence the result would have been a good one.

The great difficulty in the application of the doctrine is to determine where to draw the line. To apply it in all cases where an unexpected result occurs would hamstring the development of medical science. No medical man would dare to use new procedures, especially in surgery, because if injury resulted he would be prima facie guilty of negligence. Medical science has developed in leaps and strides in the past few years. Procedures that 40 years or even 10 years ago, would have been considered impracticable and fatal are now being successfully used; for example, surgery upon the heart. Even the procedure used in this case, translumbar aortography where the aorta is punctured and a foreign substance injected in order to determine the location of a suspected block, is one which but a few years ago would not have been attempted but one which is of great value in determining whether or not corrective surgery is needed and advisable. Thus a great responsibility rests upon the courts—to determine the point at which the doctrine will apply in order to be fair to a patient who has received a result which either common knowledge of laymen or of medical men teaches ordinarily would not occur without negligence, and to be fair to the medical men if there is a result which could occur without negligence and which should not impose upon them the presumption of negligence.[6] [6. See discussion in article 'California Malpractice,' vol. 9, Stanford Law Rev., p. 737."]

\* \* \* \* \* \*

"[2] A study of the cases both pro and con on the application of the doctrine in malpractice actions demonstrates that the doctrine is applicable only where it is a matter of common knowledge among laymen *or* medical men or both that the injury would not have occurred without negligence. See Seneris v. Haas, supra, 45 Cal.2d 811, 824–825, 291 P.2d 915, 53 A.L.R.2d 124. Plaintiff contends that there is an additional situation in which the doctrine will apply, namely, where the patient is under anesthesia and injury occurs, particularly to a different part of the patient's body than the one on which the work was to be performed, and that such application of the doctrine should be made here, because the aorta was the vessel involved and there was evidence that the spinal column was injured. Plaintiff cites Dierman v. Providence Hospital, 31 Cal. 2d 290, 292, 188 P.2d 12; Ybarra v. Spangard, 25 Cal.2d 486, 490, 154 P.2d 687, 162 A.L.R. 1258; Meyer v. McNutt Hospital, 173 Cal. 156, 159, 159 P. 436; and Bauer v. Otis, supra, 133 Cal.App.2d 439, 284 P.2d 133. However, an examination of those cases shows that while at first blush it appears that it is the mere fact that the patient is under anesthesia that causes the doctrine to apply, actually it is not so, and *the doctrine applies because the results were ones which either laymen or medical men know ordinarily do not occur without negligence.* To apply the doctrine in every case merely because the patient is under anesthesia would put a hopeless burden on the medical profession. It must be remembered that the doctrine goes further than to require the doctor to explain what happened, as, of course, he will have to do to overcome the plaintiff's charge of negligence,—it infers that he was negligent. . . ." (Emphasis added) (317 P.2d at pages 175, 176).

Our case law in Arizona supports the same analysis as made in Salgo. Our Supreme Court in Boyce v. Brown, 51 Ariz. 416, 77 P.2d 455 (1938), set out the general rules of law governing malpractice actions against physicians and surgeons as follows:

" . . . (1) One licensed to practice medicine is presumed to possess the de-

gree of skill and learning which is possessed by the average member of the medical profession in good standing in the community in which he practices, and to apply that skill and learning, with ordinary and reasonable care, to cases which come to him for treatment. If he does not possess the requisite skill and learning, or if he does not apply it, he is guilty of malpractice. . . . (citation omitted) (2) Before a physician or surgeon can be held liable as for malpractice, he must have done something in his treatment of his patient which the recognized standard of good medical practice in the community in which he is practicing forbids in such cases, or he must have neglected to do something which such standard requires. . . . (citation omitted) (3) In order to sustain a verdict for the plaintiffs in an action for malpractice, the standard of medical practice in the community must be shown by affirmative evidence, and, unless there is evidence of such a standard, a jury may not be permitted to speculate as to what the required standard is, or whether the defendant has departed therefrom. . . . (citations omitted) (4) Negligence on the part of a physician or surgeon in the treatment of a case is never presumed, but must be affirmatively proven, and no presumption of negligence nor want of skill arises from the mere fact that a treatment was unsuccessful, failed to bring the best results, or that the patient died. . . . (citations omitted) (5) The accepted rule is that negligence on the part of a physician or surgeon, by reason of his departure from the proper standard of practice, must be established by expert medical testimony, unless the negligence is so grossly apparent that a layman would have no difficulty in recognizing it. . . . (citations omitted) (6) The testimony of other physicians that they would have followed a different course of treatment than that followed by the defendant is not sufficient to establish malpractice unless it also appears that the course of treatment followed deviated from one of the methods of treatment approved by the standard in that community. . . . " (51 Ariz. at 420, 421, 77 P.2d at 457).

Although Boyce has been modified regarding the standard of care required of medical specialists to that of a nationwide rather than a community basis, Kronke v. Danielson, 108 Ariz. 400, 499 P.2d 156 (1972), Boyce remains the law for general physicians and surgeons. Fiske v. Soland, 8 Ariz.App. 585, 448 P.2d 429 (1968). In Dodson v. Pohle, 73 Ariz. 186, 239 P.2d 591 (1952) the Supreme Court, citing Boyce, said that the doctrine of *res ipsa loquitur* had no application in the ordinary malpractice case. However, in a malpractice case where a rag was left in the belly of a woman for two years following an operation and where frequent complaints of pain were made to the doctor, the Court held that she was entitled to have her case go to the jury under the doctrine of *res ipsa loquitur* on the basis that the negligence was so grossly apparent that a layman would have no difficulty in recognizing it. Tiller v. Von Pohle, 72 Ariz. 11, 230 P.2d 213 (1951). The same conclusion was reached in Revels v. Pohle, 101 Ariz. 208, 418 P.2d 364 (1966) for the same reason where steel sutures were left in the patient. *See also*, Atchison, Topeka & Santa Fe R. R. Co. v. Parr, 96 Ariz. 13, 391 P.2d 575 (1964), which cites Boyce and the need for expert testimony to establish malpractice or breach of the standard of care unless the negligence is so clearly apparent that a layman can recognize it; Kleinman v. Armour, 12 Ariz.App. 383, 470 P.2d 703 (1970); and Almli v. Updegraff, 8 Ariz. App. 494, 447 P.2d 586 (1969). *See also,* Annot. 81 A.L.R.2d 597, § 2 and § 3, Necessity of Expert Evidence to Support an Action for Malpractice against a Physician or Surgeon, citing: Stallcup v. Coscarart, 79 Ariz. 42, 282 P.2d 791 (1955); Phillips v. Stillwell, 55 Ariz. 147, 99 P.2d 104 (1940), and in later cases (81 A.L.R.2d 597), Kleinman v. Armour, supra, as representative of the great majority rule that

expert evidence is required to establish the standard of care in a malpractice case, and citing in addition Revels v. Pohle, supra, and Hardy v. Southern Pacific Employees Association, 10 Ariz.App. 464, 459 P.2d 743 (1969) to illustrate the concomitant exception or limitation of the rule that excuses such expert evidence where the lack of skill or care is such as to be within the comprehension and common knowledge of laymen to understand and judge it. Clearly Boyce v. Brown, supra, is still the controlling law governing the instant case.

In addition, see Annot. 162 A.L.R. 1265, supplemented by Annot. 82 A.L.R.2d 1262, Physicians and Surgeons: res ipsa loquitur, or presumption or inference of negligence, in malpractice cases.

Turning now to Doctors Hospital, we find that the same rules apply in hospital malpractice as in the case of physicians and surgeons. Such an institution is required to exercise the skill and knowledge normally possessed by like institutions in similar communities. Maricopa County v. Cowart, 106 Ariz. 69, 471 P.2d 265 (1970). In Doctors Hospital, Inc. v. Kovats, 16 Ariz.App. 489, 494 P.2d 389 (1972), we cited Boyce, supra, in relation to the standard of care imposed on a hospital and said:

> "The burden is on the plaintiff to establish a standard of care and to prove a deviation from that standard by expert medical testimony *unless the deviation is so grossly apparent that a layman would have no difficulty in recognizing it."* (original emphasis) (16 Ariz.App. at 490, 494 P.2d at 390).

In Tucson General Hospital v. Russell, 7 Ariz.App. 193, 437 P.2d 677 (1968), the use of the doctrine of *res ipsa loquitur* was approved in a hospital malpractice case. *See,* Annot. 173 A.L.R. 535, supplemented by Annot. 9 A.L.R.3d 1315, Res Ipsa Loquitur in Action against Hospital for Injury to Patient. *See also* our opinion in Kreisman v. Thomas, 12 Ariz.App. 215, 469 P.2d 107 (1970), where we recognized and relied on 2 Restatement (Second) of Torts, § 299A

(1965) for the standard of care required towards one relying on professed expertise, and McKeever v. Phoenix Jewish Community Center, 92 Ariz. 121, 374 P.2d 875 (1962).

This raises the second question: Whether the appellant's C-5 and C-6 vertebrae disk herniation is the type of "injury" which is so grossly apparent that a layman would have no difficulty in recognizing it as having been caused by negligence. Clearly this is not such a case.

A review of the extensive medical opinions contained in the depositions shows that the physical condition of the appellant's neck was such that entirely natural acts such as coughing, sneezing or rolling over in sleep could cause it. There is no evidence to support the allegation that appellant's neck was hyperextended by the appellees, or that if this act occurred, it would have resulted in the neck condition suffered by the appellant. Thus the first principle of *res ipsa loquitur* that the injury complained of by appellant would not normally occur in the absence of someone's negligence is simply not present here.

Even if we draw an inference of hyperextension from Dr. Nevins' purported statement, the law would still require expert medical testimony to relate hyperextension of the neck to the particular disk herniation suffered by the appellant, as this is the type of "injury" where medical expertise is needed to assist a layman since the "injury" is not grossly apparent. Furthermore, the only expert medical evidence which is contained in the record of this case is that the type of herniation that occurred in appellant's neck would not have occurred from hyperextension.

Under such circumstances, where there is no evidence that a negligent act of the appellees is more likely to cause the injury than any other possible cause, the doctrine of *res ipsa loquitur* is inapplicable. Nieman v. Jacobs, 87 Ariz. 44, 347 P.2d 702 (1959); Phen v. All American Bus Lines, Inc., 56 Ariz. 567, 110 P.2d 227 (1941).

We hold that the trial court correctly granted each appellee summary judgment in that appellant failed to show any genuine issue as to a material fact and appellees were entitled to judgment as a matter of law.

Judgments affirmed.

CASE and JACOBSON, JJ., concur.