578 P.2d 630

**Charles E. SMITH, as Personal Representative of the Estate of Marguerita Smith, Deceased, Appellant,**

v.

**JOHN C. LINCOLN HOSPITAL, Appellee.**

**No. 1 CA–CIV 3493.**

Court of Appeals of Arizona,
Division 1,
Department C.

April 27, 1978.

Robbins, Green, O'Grady & Abbuhl, P.C. by Richard W. Abbuhl, Phoenix, for appellant.

Monbleau, Vermeire & Turley, P.C. by Lawrence Monbleau, Kent E. Turley, Phoenix, for appellee.

## OPINION

WREN, Judge.

Plaintiff, Marguerita Smith, brought suit against the defendant, John C. Lincoln Hospital, which is located in the City of Phoenix, to recover for personal injuries she sustained while a patient at the defendant hospital. A five day jury trial resulted in a verdict for the plaintiff in the amount of $20,000.00. Thereafter an order granting defendant's motion for a new trial was entered. It is from this order that plaintiff now appeals.[1]

On April 24, 1974, plaintiff was admitted to the John C. Lincoln Hospital. At the time of her admission, Mrs. Smith was 75 years old and severely crippled by arthritis. She had been confined to a wheelchair since 1958 and her arthritic condition was of such severity that her joints had become ankylosed, or fixed in a bent position. She was unable to straighten her limbs, to stand or to reach out fully in front of her.

On April 25 at 9:15 p. m., the plaintiff was given Dalmane, a drug which induces sleep and can cause confusion and dizziness. In the early morning hours of April 26, she was left unattended on a bedpan and was later discovered on the floor, after falling from her bed. Mrs. Smith sustained a broken leg as a result of the fall, which eventually resulted in the amputation of her left leg above the knee.

The bed involved was equipped with top and bottom side rails which could be raised independently of each other. No notation regarding the position of the bed or its rails at the time of plaintiff's fall was entered in her hospital chart or in the hospital's incident report. The head nurse testified that she remembered the bed's upper rail was in place, but could not recall the position of the lower rail.

At the trial of this matter, Ronald B. Kunkel, M.D., and Jimmy Warren Wilson, a registered nurse, testified as expert witnesses on behalf of Mrs. Smith to establish the standard of nursing care and skill required of hospitals in the community and the defendant's breach thereof. Both witnesses were on the emergency staff at St. Luke's Hospital in Phoenix. After the jury verdict the trial court granted defendant's motion for a new trial for the reason that Kunkel and Wilson were unqualified to express the opinions to which they had been permitted to testify, and because the hypothetical questions propounded to these witnesses lacked a necessary and material fact.

The first issue with which we deal is whether the trial court correctly determined that Dr. Kunkel and Nurse Wilson were incompetent to testify as to the standard of skill and care required of hospitals in communities such as Phoenix.

A private hospital is under a duty "to exercise such reasonable care and attention for the safety of its patient as the patient's mental and physical condition, if known, may require, in proportion to the physical or mental ailments of the patient that render him unable to look after his own safety." Annot., 36 A.L.R.3rd 440, § 2(a) at 444 (1971). The measure of a hospital's duty is "to exercise the skill and knowledge normally possessed by like institutions in similar communities." *Faris v. Doctors Hospital, Inc.*, 18 Ariz.App. 264, 270, 501 P.2d 440, 446 (1972). Both Dr. Kunkel and Mr. Wilson testified that the community standard of nursing care required of a hospital in the Phoenix area in caring for a patient such as the plaintiff required that someone remain in attendance at all times while a bedpan was being used to guard against a fall. Dr. Kunkel's testimony was objected to on the grounds that his practice was limited to emergency room medicine at St. Luke's Hospital; that he had not held staff privileges at any Phoenix hospital other than St. Luke's and the State Mental Hospital and had no personal knowledge regarding the use of bedpans in any other Phoenix area hospital; and finally, that he was not a nurse. Dr. Kunkel testified that patients treated in the emergency

---

department at St. Luke's frequently required bedpans and that he had observed nursing personnel and their standards for protecting such patients from falling. He admitted that he had no personal knowledge of the standard of nursing care with respect to bedpans "on a day in, day out basis" in Valley hospitals other than St. Luke's, but stated there was a community standard which existed from hospital to hospital.

Mr. Wilson's testimony was objected to on the basis that his only experience as a registered nurse was in the St. Luke's emergency department and that his claim of expertise regarding the use of bedpans was not supported by testimony regarding the nature, extent or duration of such expertise. The record shows, however, that Mr. Wilson trained as a medical orderly at Tempe Community Hospital where he became a nursing assistant, and that, as part of his duties, assisted patients with bedpans. During his nursing training he spent four semesters at four Phoenix area hospitals, during which time he read the policies and became familiar with the safety measures for caring for bed patients at these hospitals. He testified that he was familiar with the community standard of care required of nursing personnel in caring for patients such as Mrs. Smith to protect such patients from falling from their beds.

The test of competency of an expert witness is whether he possesses a

> special knowledge which he can impart to the jury which will assist them [sic] in regard to a pertinent matter as to which the jury are [sic] presumed not to be so competent as the witness to draw the proper conclusions from the facts proved. He is defined as a person who is so qualified, either by actual experience or by careful study, as to enable him to form a definite opinion of his own respecting any division of science, branch of art, or department of trade about which persons having no particular training or special study are incapable of forming accurate opinions or of deducing correct conclusions.

*Board of Regents of the University and State Colleges of Arizona v. Cannon*, 86 Ariz. 176, 178, 342 P.2d 207, 209 (1959). Under this test an expert's testimony must be grounded upon facts known personally to him or made known to him at trial and within the scope of his special knowledge and experience. *See* Udall, Arizona Law of Evidence, § 24 (1960). We believe the subject matter in this case was within the special knowledge and experience of Dr. Kunkel and Mr. Wilson and that their testimony revealed sufficient knowledge of hospital and nursing practices in the Phoenix area to permit their opinions to go to the jury. The weight and credibility of their testimony and the extent of their claimed knowledge of nursing procedures in the Phoenix community went more to the weight of their testimony than to its admissibility. *See City of Phoenix v. Brown*, 88 Ariz. 60, 352 P.2d 754 (1960).

We are fully aware of the general rule that determination of the competency of an expert witness rests in the sound discretion of the trial court, and that the trial court's decision will not be reviewed except for clear abuse of discretion or an error of law. *Carrel v. Lux*, 101 Ariz. 430, 420 P.2d 564 (1966). Our Supreme Court in *Brown v. Beck*, 64 Ariz. 299, 303, 169 P.2d 855, 858 (1946) stated:

> The words "abuse of discretion" as used in many cases in reference to the action of a trial court is defined as, in the case of *Detroit Fidelity & Surety Co. v. Foster*, 170 S.C. 121, 169 S.E. 871, "The term 'abuse of discretion' does not mean any reflection upon the presiding judge and does not carry with it an implication of conduct deserving censure, but is strictly a legal term indicating that the appellate court is of the opinion that under the circumstances the trial judge committed error of law in the exercise of his discretion." 1 Words and Phrases, Perm.Ed., 182.

However, in view of the knowledge of Dr. Kunkel and Mr. Wilson relevant to the subject matter of this case and the relevant standard of care required of hospitals in the

Phoenix area, we think it was error to grant a new trial on the basis that they had erroneously been permitted to give their testimony.

The trial court's second reason for granting a new trial was based on hypothetical questions propounded to Dr. Kunkel and Mr. Wilson and plaintiff's failure to incorporate therein any reference to the position of Mrs. Smith's bed at the time of her fall.[2] The defendant argues that both witnesses assumed the bed was in a flat or level position at the time. When level, a 19 inch gap existed between the upper and lower side rails. According to the testimony, the plaintiff was small enough to have fallen through a 19 inch gap. When the head of the bed was elevated, there was no gap between the rails because the bottom of the bed retracted in the direction of the head drawing the side rails together. There was no evidence regarding the position of the bed or rails at the time of her fall other than the head nurse's recollection that the upper side rail was in place.

The defendant contends the position of the bed was critical, and that propounding the hypotheticals without reference to the bed's position and the witnesses' assumption that the bed was level when plaintiff fell,

misled the jury. Defendant argues, therefore, that the trial judge was well within her discretion in finding the hypotheticals improper.

■ We agree with defendant that it is incumbent upon the trial court to ensure that hypothetical questions are not framed in a manner to mislead the jury. *Decker v. Ramenofsky*, 91 Ariz. 97, 370 P.2d 258 (1962). However, where it appears a hypothetical is fair and proper under the circumstances of the case it should not be held defective because it fails to include any particular fact. *See Decker v. Ramenofsky.*

■ In the present case, the jury clearly could not have been misled by the hypotheticals complained of. Both witnesses, in substance, testified that the position of plaintiff's hospital bed did not affect their testimony that a patient in the plaintiff's condition should not have been left unattended on a bedpan. In responding to a question regarding the position of the bed, Dr. Kunkel stated:

I would say that my testimony that I have given that a person who was perched on a bedpan in her condition, that, you know, truthfully virtually any

2. The following is the hypothetical question propounded to Dr. Kunkel:

All right. I asked you to assume that the patient of Marguerita Smith's physical make-up, with her arthritic contractures and ankylosis of the joints, the restriction in her ability to extend her knees and arms. I also asked you to assume that she was admitted to John C. Lincoln Hospital on the 24th, weak and fatigued. She was having difficulty with simple tasks at home, even eating, feeding herself; that she was medicated with Dalmane, 30 milligrams at 9:15 in the evening; that she fell; that she was in bed, in a bed similar to the one that you have here in exhibit 18. Assume further and for the purposes of this question that both siderails were up and that the patient was in a sitting position on a bedpan and that she was left unattended, and that between the time—the hours of 1:30 and 1:45 she fell from the bed and fractured her leg. Do you have an opinion, sir, under that set of circumstances, whether or not—first of all, there is a community standard of care for the care in preventing a patient under those circumstances from falling and injuring themselves?

The hypothetical question asked of Mr. Wilson was:

Mr. Wilson, what are the circumstances—I'm sorry. What are the standards of good nursing practice required in caring for a patient who is in the physical condition that Marguerita Smith was with her severe arthritis, her ankylosing joints, her weakness and fatique, which was noted by the doctors and the nurses on her admission to the hospital? The fact that she, on admission, was having difficulty with simple situations, such as eating and taking care of her normal functions. Assume that she was admitted to John C. Lincoln on the 24th, as you found on the chart; that Dalmane, 30 milligrams was given at 9:15 in the evening as a sleeping medication; that the patient was placed on the bedpan, unattended on a bedpan in the bed at approximately 1:30 in the morning. Under those conditions do you have an opinion as to what the standard of care would require with respect to a nurse taking care of the patient at that time?

bed would be unsafe in that type of condition; if the rails were down, if the rails were up, you know.

Mr. Wilson, also questioned as to the bed's position, stated:

I'm not speaking of position of the bed at all. Just using the bedpan is the only opinion I made. And I think in any position on the bed it would be advisable to be there to assist the patient.

For the reasons stated we hold the trial court erred in granting defendant's motion for a new trial on the basis that plaintiff's hypothetical questions were improper.

The order granting a new trial is reversed and the case is remanded for reinstatement of the jury verdict.

DONOFRIO, P. J., and SCHROEDER, J., concur.